Case number 16-7042, David L. De Csepel et al. v. Republic of Hungary, a foreign state et al. appellant. Mr. Stalber for the appellants, Ms. Beninetti for the appellees. Mr. Stalber, good morning. Good morning, Your Honor. On behalf of the Hungarian government and certain of its agency and instrumentality in museums, along with my colleague, Ms. Sarah Andre on brief, it is my pleasure to argue before this court. We are back before this court because the district court took the extraordinary step of taking jurisdiction over a foreign sovereign under a jurisdictional provision in the very limited Sovereign Immunity Act, which is factually, legally, and temporally unrelated to the underlying commercial cause of action. That is something that no other court, be it in the D.C. Circuit, the New York Circuit, or anywhere in this land, has before occurred. Well, let me ask you about that. You say it's factually and legally unconnected to the bailment, right? Yes. The district court found that at least some of these paintings were never returned to the family. Yes. And you don't challenge that? We do not. So why isn't that your factual and legal connection? They were seized by the Nazis, never returned, and now they're in a bailment. What more do you need? They were seized by the Nazis in 1944. That is, Your Honor, right, the underlying expropriation. But we are at the motion to dismiss phase. And as the complaint is alleged and set forth, it sets forth two causes of action which spring from the breach in 2008. Could you just answer my question? It is not legal. The question is, why aren't they, why isn't there a direct factual and legal connection to the bailment since they were seized, never returned, and are now in an alleged bailment? Because, Your Honor, that creates a seizure. That does not create a contractual bailment or other type of relationship between the Hungarian government and the plaintiffs at this point in time, Your Honor. I don't understand your point. Well, Your Honor, in addition to the court and we agreeing that the works were seized, the complaint has set forth two causes of action, a breach of the bailment and a conversion as a result of the breach of that bailment. Both of those breaches tie back to the 2008 decision from the Hungarian courts, not to the 1944 taking in violation of international law. And this presents to us the quandary that we find ourselves in because if you use the expropriation exception to take jurisdiction over a commercial claim, as the court also found, at least 11 of the artworks, there is no conceivable evidence at all of a bailment. But then how is that any different from Simon? Simon is... Simon, there were, as the court said, garden variety, common law claims. And that fell within the exception because there was a right in property taken in violation of international law issue in the case. That's the same thing here. In fact, you could replace the words in Simon with bailment and you'd have this case. I submit you would not, Your Honor, because in Simon you had unidentifiable property. In this particular case, we have 44 separate and distinct individual works of art which are separate pieces of property attributable to particular individuals. In this particular case, in addition to the court finding that the works were taken, we have at least 11 of the artworks to which the court said there is no, absolutely no evidence of a bailment. So you have an expropriation jurisdiction without any viable cause of action and then we pull the foreign sovereign in. The other reason why this doesn't work, Your Honors, is that under the Foreign Sovereign Immunity Act, under the expropriation exception prong, to take jurisdiction over the foreign sovereign where the property is not present in the United States or otherwise exchanged for property that is present in the United States, you cannot take jurisdiction over the foreign sovereign. It's very limited. Two Solicitor General advisory opinions have been issued on this point, most recently in the Casir case in which we're involved for the Spanish government and even more recently for Helmer. I just don't understand how you get around Simon. In Simon, there was a right in property taken in violation of international law at issue, right? There and here, that right is the right to possess the property. The right to possess the property in our particular case, according to the plaintiff's complaint, springs from a contractual relationship, a bailment, which they allege was breached in 2008. In Simon, the claim arises from the 1944 takings and the taking at that time and the continuous holding of that property. There is nothing commercial about the Simon case. Go ahead. Do you rely on Simon for the holding in Simon that under 1605A, with respect to not the agencies but the country itself, agree that the property has to be in the United States? Yes, we do, Your Honor. What do you do with Chabad? We don't think those are at all inconsistent, Your Honor, because in Chabad, the court was dealing with the Russian government in that particular case, as you know. And in Chabad, yes, the property was located in Russia. But in Chabad, the issue was not before the court, not specifically before the court because the Russian government did not raise it. Once the court found jurisdiction under the exception over the agencies, it just swept in the Russian government. At that point in time, the Russians stepped away from this case, stepped away from their case, I should say, and let a default judgment get taken up on them. So it was jurisdiction by consent? It was jurisdiction by waiver, jurisdiction by consent. But there's no specific finding in that case that you can blur the lines between a commercial taking and an expropriation. There's no specific finding. That's not what I'm talking about. I'm talking about the expropriation jurisdiction. And you've got in Simon, the court holds that the property for the country itself, not the agencies and instrumentalities, for the country itself, the property has to be in the United States. In Chabad, the court holds the property doesn't have to be in the United States so long as the agencies and instrumentalities are operating a commercial venture in the United States. Those cases are, in my mind anyway, impossible to square. Well, Your Honor, I think they can be squared as follows. It's implied in the Chabad case, if not a specific holding, that it analyzes the point. And in the Simon case, It's not implied. The end of the discussion says that we therefore have, as I recall it, that we therefore have jurisdiction over Russia. You're right. That's exactly what happens. But my point is that the Russians never raise the issue. They don't bring it to the court's attention. It's not a brief issue. And the court stops its analysis short by simply saying we've got the agencies and instrumentalities, therefore I guess we get the Russian government. They raise no objection to it. They stepped away from the case and did not bring it back. In Simon, however, it was squarely before this court. And it came back before the panel on a reconsideration. And on the reconsideration, both parties briefed extensively the issue as to whether you could take jurisdiction over Hungary when the property is not present in the United States or exchanged for property present in the United States. And in Simon, the court rejected the reconsideration of the panel. So it remanded it back, and now there's a question as to whether there is any property in the United States or not. As to our case, there is absolutely no allegation in the motion to dismiss or anywhere else that the property is present in the United States. This only goes to the Republic of Hungary. This only goes to the Republic of Hungary. And we would submit it is only. And it demonstrates why when you have an expropriation claim, expropriation jurisdiction, and you attempt to slam it into a commercial exception with cause of action, they don't fit. They're inconsistent. And you end up with the result of, yes, having to retreat back to the expropriation exception, but because it is a very limited exception, and we afford foreign sovereigns a greater deference to deal with property that is within the territory of those sovereigns, particularly in a case where we have individual property, we have 44 works, which now as we come back before this court, before Judge Tatel on the last panel, we know they're separate and distinct property. We know that at least 24 of the artworks belong to Italians. We know at least 8 of the artworks belong to Hungarians. Only 12 of the artworks have any connection at all with the United States. And with respect to those 24 from the Italians, not only did they decide not to participate in litigation in Hungary, they in fact said we don't want to submit evidence that we may have to support our claim. So while I think your point on Simon is well taken, it also demonstrates that this is a case where exhaustion under international comedy is very appropriate, and the Hungarian government is only seeking consistent treatment between Fischer, Simon, and today's case. Let me ask you something about that. You predicate appellate jurisdiction on the 28 U.S.C. 1291 final judgment, right? That was not the predicate for jurisdiction the last time this case was here. There was a 1292B that was issued by the district court because there were non-final judgments that the district court reached in that case and that were up on appeal. So if you're relying on the final judgment rule, then I suppose, although there's no discussion of this in either side's groups, that you're dealing with the collateral order, is that right? Well, I'll be honest with you, Your Honor. You've got me there. But what I do know is that we're back. The judgment that you're appealing from was not a final judgment. Correct. Right. You rely on the final judgment rule of 28 U.S.C. 1291. Right. So how do you get appellate jurisdiction? If it's not a final judgment, it was not a final judgment, you rely on the final judgment rule, how do we have jurisdiction? So in your position, the appellate court here can't take jurisdiction to hear our argument with respect to the exhaustion because in Simon it was in a different context? Am I understanding correctly? That's exactly where I'm going. Because I can see wedging this into the collateral order doctrine on the basis that you have a right not only to immunity, but a right not to have to go through proceedings leading to a final judgment. But the exhaustion doctrine question is not to my mind. I have no cases that have held that a ruling on failure to exhaust is within the collateral order doctrine. And nobody cites it. You're right. Nobody does cite it, John. We'd be happy to supplement it. But I do think that we have had the issue of exhaustion before this court in Simon, which was taken up sua spanae at that point in time. We have properly briefed it and presented it to this court.  Am I correct in remembering Simon that Simon was an appeal from a total dismissal? Simon was an appeal from a motion to dismiss. Whether it was total or not, I don't know, but it also came up on the Foreign Submunity Act with respect to an immediate interlocutory appeal. In our particular case, we have taken and went back to the court and took extensive discovery. And we know from that discovery, which is presented to the court, that we have separate and distinct claims which have not been exhausted in any way, shape, and form in Hungary, whether they be with respect to the 24 artworks from the Italians or the eight artworks from the Hungarian side of the claims. And so we put Hungary in a very interesting position where we're now saying we're taking jurisdiction over an expropriation exception relating back to 1944, but you've been dealing with a complaint for the last six years that was based on a commercial breach, a commercial breach which is alleged to have occurred because your courts, your independent courts, heard a case for eight years and made factual findings in a decision with respect to ownership  For example, there is no statute of limitations in Hungary with respect to these types of claims. In addition, the 1973 agreement, which was used in that particular proceeding, to bar the claims of the American representatives because they claimed that they had submitted to the Foreign Claims Settlement Conference that the property had been taken from them during the communist era and therefore they were right to get compensation for it, and therefore their claims were barred. That's not going to be a defense that's available to the Hungarian government with respect to the Italian claims or the Hungarian citizen claims. So what we end up with, because we have taken what was a contractual bailment claim where there was no direct effect in the United States, we end up finding ourselves trying to square an expropriation claim into a commercial claim, something that has not been done before, whether it's this court or any other court. And GAR gives us good instruction to say that we cannot allow the plaintiff, through creative language and creative meandering around, to find a cause of action that fits the claim or jurisdictional basis that they wanted to do. It's a transformation that simply doesn't work. And once you try doing that, we find that the Hungarian government itself doesn't belong in this case under an expropriation exception. What are the implications of all this for the newly enacted Recovery Act that was enacted during the pendency of this litigation? If we send that back with directions to allow the plaintiffs to amend their complaint, what are the implications of that for all this? Well, if the court is speaking to the HERE Act, which was recently passed, my submission to you would be there's actually no implications to it. The HERE Act is not a jurisdictional statute. The HERE Act simply deals with the statute of limitations from date of discovery to six years and provides exceptions. But I would submit to you we still end up with the problem that you can't take jurisdiction over the Hungarian government because they'd have to go back and make an expropriation claim, but the property is not in the United States. So the HERE Act has no implications. The other is the HERE Act was not meant to reopen cases that have been final. So you'd have a question as to whether or not final case, which was with respect to at least 11 other claims, would reopen it. What is the evidence for that? Excuse me, Your Honor? What is the evidence for that? Well, the evidence is the 2008 decision that was in the Hungarian judicial system. No, but this Act was passed last year, right? The HERE Act was passed this last year, yes. Yeah, that's my question. And the HERE Act states that it does not reopen cases that are otherwise final and now appealable. But this is an open pending case. This is an open pending case here, yes, Your Honor. Okay. But my point is that within the HERE Act itself recognizes that international comedy could be applied and should be applied to enforce the Hungarian judgments. With respect to the Italian claims, with respect to the Hungarian claims, and even with respect to the U.S. plaintiff's claims, if we go back to the 1944 taking, then clearly there was discovery that the property was taken in 1944. And the statute of limitations, be it six years, be it 10 years, be it 30 years, be it 40 years, would still be applicable. And there is an exception in the HERE Act which states that if you were aware of your claim and would have been able to bring your claim, the otherwise applicable statute of limitations would apply. So we'd be right back to the Washington, D.C. statute of limitations. Now, I understand that in a motion to dismiss, that might be a whole lot to swallow. But it's right there in the complaint as it's pledged. So amendment back or remand back would be futile with respect to the Hungarian government anyway because now you have to make an expropriation claim because we know a commercial claim doesn't work. I think it's important to note that not only was the HERE Act passed, but Hungary in its own country, and in recognizing the need to continue to examine these cases, in 2013 passed special legislation which is consistent with the Washington principles, which is consistent with the Terrorism Declaration, which says we are going to hear cases on the merits to the extent they arise from the Holocaust era. That is a remedy that is there and available to the Herzog family, the de Gepel family, the Italian claimants that have not presented their claims before. So what are the ramifications, Your Honor, of the HERE Act? What are the ramifications of the Hungarian regulations? I think all of them tell us that the case is properly brought and heard in Hungary where these historical events happened and occurred. And the Foreign Sovereignty Act provides for very limited exceptions, very limited exceptions, in which we are going to take jurisdiction over Hungary, particularly with property that is not present in the United States. All right, we'll give you a couple of minutes in reply. Thank you very much. Ms. Benenati? Good morning, Your Honors. May it please the Court, I'm Alicia Benenati from Kazowitz, Benson, Torres & Friedman on behalf of the appellees David de Gepel, Angela Herzog, and Julia Herzog. Judge Titel, you got it exactly right. This case is like Simon. Just as in Simon, there is no dispute that the 42 artworks that remain in this case were all taken by defendants and their Nazi collaborators during World War II as part of a broader campaign of genocide against the Hungarian Jews. And just as in Simon, the claims at issue in this case squarely place the rights and property that were taken in violation of international law in issue. Now, in Simon, the court held that claims for conversion and unjust enrichment were property-based claims that fell comfortably within the expropriation exception. Our bailment claims here are no different, and we also have claims for conversion and unjust enrichment as well. And the unjust enrichment claim in particular, I would submit if you look in the complaint, directly ties back to the taking of the collection during World War II. But the difference with Simon is you may have a legal claim that's similar, but Simon had identical facts. And with the bailment in particular, you have different facts, unless you're arguing that any property expropriated originally as part of genocide keeps that taint if it ever ends up again in the hands of the Hungarian government and its agencies. No, that's not what we're arguing, Your Honor. But with respect to the vast majority of the artworks that are pleaded in our complaint, they were taken during World War II, and they were never returned legally, physically, or otherwise. The district court found evidence that at most 15 artworks were returned to the family. Everything else was taken during the war and remained in the possession and custody and control of the museums. And so while there may have been subsequent events where the museums acknowledged, yes, the Herzog family owns this art, yes, we're holding it as a custodian, the fact is the artworks only came into the museum's possession in the first place because of the events of the Holocaust. All right, but some of them were physically given back, were they not? Yes. It wasn't all on paper. Correct. Of the 15 that the district court found there was some evidence of return, at least some portion of those, there were some that, yes, they were physically returned to the family for a very brief period of time before they were re-seized. And even as to those artworks that were taken back, in this case, what distinguishes this case from other cases where the facts might be more remote is that when the artworks were brought back into the museum, they were done so as a direct result, again, of events that had happened during the Holocaust. The seizure of the artworks belonging to Istvan Herzog were as a result of a Holocaust-era contract that he entered into with his non-Jewish wife where he said that the artworks belonged to her, and that was the agreement that became the predicate for her alleged smuggling conviction. Now, she put it in affidavit saying she never smuggled anything. This doesn't have anything to do with the number, with those artworks that were never, I mean, there may be some things for the district court to sort out, right, with respect to art that was either returned and repossessed or seized or forfeited in some other way. But is it your point that with respect to a particular number of these, I don't know what it is, they were never returned, right? So the case you're now talking about is irrelevant to that group of paintings, correct? Correct. Maria, what do you do with the Simon's holding that with respect to the Republic of Hungary, the property has to be in the United States? The Simon court seemed to be under the impression that their decision was consistent with Chabad, and I think as Your Honor correctly pointed out, it's not. In the Chabad case, the court clearly sustained jurisdiction over Russia and the Russian State Library and the archive based on the fact that the library and the archive were agencies or instrumentalities of Russia that were engaged in commercial activity in the United States. But didn't, in the petition for rehearing before the panel, the argument about Chabad was made, correct? It was, correct. And so why don't we, what we essentially have, it seems to me, is a decision by the Simon panel, having looked at Chabad, that for whatever reason, Chabad didn't decide the question of Russia's continued involvement in the case, right? Right. So that means Simon's binding on this court. We have a circuit split, basically. No, you can't, you mean an intra-circuit split. Intra-circuit split, and also a circuit split. No, you can't have an intra-circuit split. The rule is that if there's a real split, the earlier decision controls. So the question is, does Chabad control? I would submit yes. No, but I just asked you, you made the Chabad argument before the Simon panel, and it disagreed with you, so don't we have a decision by that panel that Chabad did not resolve the jurisdictional issue, that it didn't address it? Do you see my point? I do see your point, Your Honor. Yeah, that's my question. But the Chabad court is not the only court to have reached this same conclusion. The Altman case, which went all the way to the Supreme Court, sustained jurisdiction over the Republic of Austria and the Austrian National Gallery based on exactly the same criteria, that the artwork at issue was located in the Austrian National Gallery in Austria, and that the Austrian National Gallery was engaged in commercial activity in the United States. Now that case came out of the Ninth Circuit, but it went all the way to the Supreme Court, and nobody ever suggested that Austria should be dismissed, and Austria participated in that litigation the entire time. Nobody ever said it should be dismissed on the grounds that the property wasn't present in the United States, and that's because the language of the statute is unambiguous. The language of the statute says that a foreign state is subject to the jurisdiction of the courts if either test is met. It doesn't say that a foreign state is only subject to jurisdiction if the property is present in the United States, and an agency or instrumentality is only subject to jurisdiction if the property is owned or operated, and the agency or instrumentality is engaged in commercial activity. It's an alternative test that applies to a foreign state. I have a practical question. What difference does it make if Hungary is not in the case, as long as all these artworks are in these museums that are defended, correct? I'm sorry, all the artworks? All the artworks are in the museums that are defended, right? They are, but... So does it make a practical difference? I think it does, Your Honor, insofar as Hungary owns the art. The museums display the art. The museums operate the art, but Hungary owns it. So you have a disconnect there where you have defendants in the case who are in possession of the property, but who don't own it. I see. I see. What's the relief you're seeking? We're seeking restitution of the art and in the alternative damages. Could you get damages against the museums alone? In theory, I suppose yes, Your Honor, but that's not the relief that the family is seeking. These are unique artworks that were taken literally from their homes during World War II. This is a case where damages doesn't really remedy the wrong. Only getting the art back would remedy the wrong. Has there been an evaluation of the pieces of art? Formally in the case, no, but informal evaluations have placed the value of the artworks in excess of $100 million. Could you just state as clearly as you can your response to Mr. Stauber's argument that this case is that the bailment claim here is somehow different from the claims in Simon? That the bailment claim is different from the claims in Simon? Yeah, that was his argument. His argument is Simon doesn't control here because this is a bailment claim. Right, and I disagree with that. Yeah, right. That was us asking, could you just state clearly, explain the difference? Because regardless of whether this claim is based on conversion, unjust enrichment, or bailment, rights and property are still in issue for purposes of Simon, correct? That's the holding of Simon. That's the difference in language between 1605A2 and 1605A3 of the FSIA. Under the commercial activity exception, the claim has to be based upon commercial activity. 1605A3 doesn't say that. You don't have to have your claim be based upon the taking. The rights and property taken in violation of international law just have to be in issue. And we have that here. And what are the consequences of the newly enacted statute? So the HERE Act applies to, as you say, pending litigations, including to this case. And what that act has done is it's reset the clock so that six years from the date of the enactment of the act, you can still bring a claim for a Holocaust-era taking. And I disagree with Mr. Stauber's interpretation that that would in any way bar the claims in this case. We believe, and we're happy to fully brief that, that the HERE Act would resurrect the statute of limitations for any World War II conversion claim that we would seek to bring at this point, that the three-year statute of limitations that formerly applied, you know, the state statute for the District of Columbia has now been preempted by this federal law and that claims for a World War II conversion are no longer time-barred. And would that have any impact on whether Hungary's a proper party defendant? It wouldn't, right? I mean, if it isn't a proper party defendant because of Simon, it still won't be under the new legislation. That's correct, because regardless, the property's not in the United States. There's no dispute about that. And is there anything, if you're allowed to amend your complaint under the newly enacted statute, which resurrects your claims that were barred, right? Correct. What does that add to what you have here? Did you see my point? In other words, does that give you all the relief you need to go, all the basis you need to go forward in your claim? Well, it simplifies things insofar as then you don't need to even reach this question of whether a bailment claim falls within the expropriation exception if there's an expropriation claim. Well, that's what I was wondering when I was reading these briefs. I mean, if you're allowed to amend your complaint, these issues are irrelevant, right? Yes, that particular issue is irrelevant. And, you know, even also insofar as if the district court finds, for whatever reason, at the end of the day with the factual record that we've developed through discovery, that we can't establish a bailment with respect to a handful of the artworks because there's just not enough in the record. If she finds that conclusion, then being able to assert an expropriation claim for the takings during World War II would potentially help with those artworks as well. So if all we did was remand to allow you to amend your complaint, would you have everything you need? I think we would, Your Honor, except that then we'll be right back, you know, if that's all that you do and you give us no guidance on the law, then we'll be right back here in another four years. Which aspect of the law? You said the bailment thing then becomes irrelevant, right? In terms of whether Hungary remains a defendant. Oh, no, forget that. I'm not asking about whether Hungary remains a defendant. I'm asking about the other issues, your claims against the museums. You have Simon, which makes it clear this is an expropriation violation of international law, right? Yes, I agree we're squarely within the Simon decision in this case. So what if you're able to amend your complaint? In other words, set aside the question of whether Hungary is a defendant, all right? From your perspective, do you need anything from this court other than the ability to amend your complaint? I don't think so, Your Honor. Okay. Thank you. All right. Thank you. He doesn't have any time left. Why don't you take two minutes? Thank you, Your Honor. I would submit that we find ourselves in this difficult idea of trying to figure out how to make jurisdiction work with completely unrelated causes of actions because, in fact, we've gone through six years of full factual discovery. And we have presented to the district court, which has made factual findings, that, in fact, at least 11 of the artworks, there's absolutely no evidence of bail. Fifteen of the artworks, in fact, were physically and legally returned. So we would contend that in those contexts, it demonstrates why there has not been before today a case in which a completely or even temporally unrelated cause of action, as pled in a complaint, is allowed to bootstrap in through the expropriation exception. And the reason that the statute is plain on its face, when you're going to deal with an expropriation claim, the property has to be present in the United States because in the foreign sovereign immunity world, there are very, very strict instructions before we're going to hail a foreign sovereign into this court. Hungary, unlike Russia, has actually participated very actively and openly in the discovery process in this case and made the arguments before it. In the Altman case, which was also brought up here today, that came forward in the Ninth Circuit, the question as to whether or not the Austrian government was properly in the case as a defendant because the property was in Austria was never before this court. The fact that the Austrians chose not to make that argument is neither here nor there. The fact is that the Foreign Sovereign Immunity Act was examined for its retroactive effect from the Supreme Court level and was decided that it should reach back and allow for those claims. But in this particular case, solid authority in garb and twice expressed by the Solicitor General, most recently in the Helmholtz decision and before that in the Casir case, where we see the Solicitor General saying, wait a minute, we can't be taking jurisdiction under the expropriation exception over a friendly foreign sovereign in the Kingdom of Spain or even a not-so-friendly foreign sovereign in the case of Venezuela. Here, we have a friendly foreign sovereign, a member of good standing in the European Union, which the implications of amending a complaint after six years so someone can create a cause of action which is futile against the Hungarian government in the first place and is wholly inconsistent with the participation of a foreign sovereign in this litigation. We would submit that it is not appropriate at this stage to remand this case for an opportunity for leave to amend. But we also would submit that whatever the court does, having clear direction, which we think is very clear from Simon, we think is very clear from Garb, that exhaustion is appropriate in this particular situation, especially as to the Italians and the Hungarians, and that bringing Hungary into this case in this late date or keeping them in when their arguments don't support it is futile. Let me ask you a question about the facts. These numbers keep floating around. The 15 number is what? The bailment? No. There was 44 artworks originally claimed. Right. Two of those artworks the trial court found there was no jurisdiction over because they came into Hungarian possession in the 1960s or 1950s. Those are out. We have 42 left. Okay. Of the 42, the court made a factual finding that 15 of the 42 were physically and legally returned after the war pursuant to the Paris Peace Treaty, which this court is very familiar with, because Hungary was doing its best, at least in that particular situation, to try to comply with its obligations under the treaty, which is where we would submit the treaty then steps in because it is actually been enforced. Where are the 15? What happened to the 15? The 15, along with the rest of the artworks, came into the Hungarian state's possession through various means, each one individually and separately, which is why we would also submit when the court then just grabbed everything from a jurisdictional basis under the expropriation exception. While it started down the right path of analyzing each work individually and separately for purposes of a commercial exception, when it realized that didn't work, it just threw a net over all of them, which violates the basic tenet of the Foreign-Side Immunity Act. Why did you separate out 15? That's all I'm trying to find out. All I'm trying to point out to the court is that we have a factual finding that the Hungarian government post-World War II complied with its treaty obligations and physically returned the specific property that it was able to to the representatives or directly to the Herzog heirs. And so in the context of those 15, those are no longer fitting within the expropriation exception. That property was fully and fairly returned to the extent it was taken, again, it was taken during the communist era, pursuant to sovereign acts, not violations of international law, which is, again, why we end up in a futile exercise of amending the complaint. And of the remaining 27, some the district court found had never been returned and some have been, or what do we know about those 27? We know that those 27 are in the possession and ownership of the Hungarian state. Right. Those are the ones we're talking about here. And those are the ones that we're talking about here. And with respect to those, we know that as to a potential bailment claim, after full factual discovery, the court made a finding that as to 11 of them, there was absolutely no evidence expressed in flight or otherwise that there was even a bailment, that there was a bailment. But the district court also found that there was no break in possession with respect to many of them, correct? That is correct. There was no break in possession. Many of them were never returned. That is correct. They were always in the possession of the Hungarian museums, correct? Yes, that is correct. And that is no different than a lot of property that had nothing to do with artwork but came into the possession and the ownership of the Hungarian state after World War II in connection with communist-era takings, which is why we have the 1973 agreement, which was negotiated and put in place during the Nixon era, so that Hungary, in its efforts to reengage with the community during the Cold War, stood forward and the Herzog family, rightly so, made a claim to the Foreign Claim Settlement Conference and stated to the appropriate commission that their artwork had been taken from them during the communist era when they were U.S. citizens. Seven of the artworks that are in dispute here fit into that category, which is why we submit, when you open the case back up for an expropriation exception, as compared to the commercial activity exception, you end up needing to reanalyze the treaties, the 1947 Paris Peace Treaty, the act of state, the political question. It changes the complete dynamics of this case, and therefore we submit that moving it back and amending a complaint to try to bring in a different cause of action is not an exercise that should be entered into.  Thank you very much, Your Honor.
judges: Henderson, Tatel, Randolph